NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL SOSA,<br><br>*Plaintiff*,<br><br>v.<br><br>GREATER ALLIANCE FEDERAL CREDIT UNION; TRANSUNION, LLC,<br><br>*Defendants*. | Civil No.: 20-cv-0818 (KSH) (ESK)<br><br><br>**OPINION \*FILED UNDER SEAL\*** |

**Katharine S. Hayden, U.S.D.J.**

I.   **Introduction**

In this matter, plaintiff Michael Sosa alleges violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") by defendants Greater Alliance Federal Credit Union ("Greater Alliance") and TransUnion, LLC ("TransUnion," and with Greater Alliance, "defendants").  He contends they violated the FCRA by incorrectly reporting a debt he incurred with Greater Alliance on a TransUnion credit report and failing to adequately investigate his disputes.  Before the Court are two motions for summary judgment—Sosa's motion for summary judgment on the issue of liability only (D.E. 48), and Trans Union's cross-motion for summary judgment on both liability and damages (D.E. 49).  Also before the Court is Greater Alliance's motion to exclude certain expert testimony (D.E. 50).

II.   **Factual Background**

   a.   **The Parties**

Sosa obtained a personal loan of $2,054.24 from Greater Alliance in December 2012. (D.E. 48-3, Pl. Stmt. ¶ 5.)  TransUnion is one of three major credit reporting agencies in the

United States. (D.E. 69-2, GA Stmt. ¶ 8.)[1] It receives information from creditors like Greater Alliance, known under the FCRA as "furnishers," and assembles that information into credit reports, which can be made available on request. (D.E. 49-2, TU Stmt. ¶¶ 7-8.) Consumer credit reports have "account entr[ies]" that are known as "tradelines," which "typically include[] information like the account type, opening date of account, credit limit, account status, and payment history" of the consumer, as well as "the name and address of the creditor." *Dreher v. Experian Info. Sols. Inc.*, 856 F.3d 337, 341 n. 3 (4th Cir. 2017) (internal citations and quotations omitted). This matter concerns one such tradeline in Sosa's credit report published by TransUnion.

### b. Sosa's Greater Alliance Tradeline

At some point, Sosa became delinquent on the Greater Alliance loan, and in 2014 the account was charged off. (Pl. Stmt. ¶ 6; GA Stmt. ¶ 2.) In March 2015, Sosa settled with Greater Alliance's collection agency and he satisfied the debt that May. (Pl. Stmt. ¶ 7; GA Stmt. ¶¶ 2-3.)

Three years later, on or around July 16, 2018, Sosa reviewed a TransUnion credit report and noticed that in several respects his Greater Alliance tradeline was inaccurate. (Pl. Stmt. ¶ 8.) For example, his account's pay status was "Charged Off" instead of "Paid-Charged Off"; the closing and last payment dates were respectively June 2018 and December 2013, instead of May 2015; and the account listed a monthly payment obligation, even though it had already been paid off. (*Id.* ¶ 9.) The tradeline is reproduced in full below:

---

[1] The other two agencies are Experian and Equifax. (*See id.*)



(*Id.*)

Both TransUnion and Greater Alliance concede that the tradeline was technically inaccurate, and each contends that the other is to blame.

### i. Sosa's July 2018 Dispute

When Sosa discovered the errors in the TransUnion report, he called TransUnion to dispute the information in the tradeline. (D.E. 49-4, Kimp Aff. ¶ 28.) TransUnion followed its normal protocol and initiated a "reinvestigation"—that is, it contacted Greater Alliance through an Automated Consumer Dispute Verifications form ("ACDV") to verify the tradeline's accuracy.[2] (*Id.* ¶¶ 11, 31.) The ACDV form indicated as follows: "CONSUMER DISPUTE: Claims company will delete. Verify All Account Information. Disputes Current Balance and/or Amount Past Due. Verify Current Balance or Amount Past Due." (*Id.* Ex. A-1.)

Greater Alliance received TransUnion's ACDV form through e-Oscar, the computer portal that handles credit reporting to all credit reporting agencies. (D.E. 69-4, Socha Tr., 10:12-14.) Greater Alliance employee Cheryl Socha testified during her deposition that on July 30, 2018, she took a "screen shot" of Sosa's account information on e-OSCAR, which indicated that

---

[2] As will become clear, the ACDV system uses codes to facilitate the transfer of information between TransUnion and its furnishers. (TU Stmt. ¶ 26.)

the account was reporting as "settled charge off and account paid in full for less than the balance." (*Id.* 87:7-9, 88:8-23.)[3] However, she noticed that the account was reporting an incorrect closing date in June 2018, which she claims to have updated.[4] (*Id.* 47:3-7, 72:2-9, 73:9-18.)

On July 30, 2018, the same day Socha took a screen shot of Sosa's account information, Greater Alliance responded to TransUnion's ACDV with the "Response Code" of "01 ACCT INFO ACCURATE AS OF DATE REPORTED," which included an "Account Status" of 97, a "Special Comments" code of "AU," a "Date Closed" of June 30, 2018, a "Last Payment Made" date of December 26, 2013, and a "Last Updated Date" of July 13, 2018.[5] (Kimp Aff. ¶ 32, Ex. A-1; D.E. 67-1, TU Resp. Stmt. ¶ 11.) The next day, TransUnion sent Sosa the results of its reinvestigation. (Kimp Aff. ¶ 33, Ex. A-2.)

---

[3] Sosa seeks to exclude three of Greater Alliance's supporting exhibits—a screenshot of the e-OSCAR system, a copy of a bullseye report, and a copy of an Automated Universal Dataform ("AUD") (*see* D.E. 69-6, 69-7, 69-8)—because they lack foundation and/or are inadmissible hearsay. (D.E. 75-1.) Socha testified about these documents during her deposition, apparently without objection, and the Court considers them for purposes of the parties' competing dispositive motions.

[4] Greater Alliance explains that while it has always furnished account information to Experian, in June 2018 it also began furnishing to TransUnion and Equifax. (GA Stmt. ¶ 8.) Thus, June 2018 is "when [Greater Alliance] started furnishing the account information to TransUnion rather than the date when the account was closed." (*Id.* ¶ 16.)

[5] Defendants agree that because a "Status Code" of 97 reflects a charged-off account and 64 reflects an account that has been paid in full, the ACDV response should have listed 64, though Greater Alliance contends that it did in fact furnish a 64. (TU Resp. Stmt. ¶¶ 12-13 15-16; D.E. 69-1, GA Resp. Stmt. ¶¶ 12-13, 15.) They further agree that a "Special Comments" code of AU means that the account was paid in full for less than the full balance. (TU Resp. Stmt. ¶ 14; GA Resp. Stmt. ¶ 14.)

4

### ii. Sosa's August 2018 Dispute

Weeks later, on or about August 23, 2018, Sosa sent TransUnion a written dispute stating: "This account is false reporting.  This account was paid in full in settlement, current status should reflect the current status.  The timing of this account is incorrect and the terms of this account are incorrect.  Needs to reflect accurately!"  (Pl. Stmt. ¶ 20; Kimp Aff. ¶ 34.) TransUnion initiated another reinvestigation and sent a second ACDV form to Greater Alliance regarding the dispute.  (Kimp Aff. ¶ 35.)  The form indicated, among other things: "CONSUMER DISPUTE: Claims paid the original creditor before collection status/paid before charge off.  Verify Account Status[.]"[6]  (D.E. 69-14, Siachos Decl. Ex. K.)

Greater Alliance responded to TransUnion verifying that the reported information was accurate.  (*Id*.)  On September 5, 2018, TransUnion sent Sosa the results of its reinvestigation. (Kimp Aff. ¶ 37, Ex. A-5.)

### iii. Sosa's March 2019 Dispute

On or about March 18, 2019, TransUnion received a third communication from Sosa disputing the information in the tradeline.

> This account has been false reporting! Originally opened in 2012 and later settled PAID in 2015.  This account was paid off and settled.  Current status should reflect its current status, should reflect the accurate dates.  This is affecting my credit and has lowered my credit score significantly.  I have contacted Greater Alliance many times and they have not been compliant in correcting its reportings.  Attached is a copy of the settlement check in reference to this acco[u]nt.

(*Id.* ¶ 38, Ex. A-6.)[7]  Again, TransUnion initiated a reinvestigation and transmitted an ACDV form to Greater Alliance regarding the dispute.  (*Id.* ¶ 40.)  The ACDV form indicated as

---

[6] TransUnion does not dispute that it attached a copy of Sosa's dispute letters to its ACDV forms, as denoted by "IMAGE: YES – 1" in the top right corner of each form.  (*See* TU Resp. Stmt. ¶¶ 21, 22.)

[7] TransUnion has no record of an attached settlement check.  (*Id.* ¶ 39.)

follows: "CONSUMER DISPUTE: Claims paid the original creditor before collection status/paid before charge off. Verify Account Status. . . . Disputes Date Opened, Date of Last Payment and/or Date Closed. Verify Date Opened, Date of Last Payment and/or Date C[losed]." (*Id.*, Ex. A-7.) Once again, Greater Alliance responded the account was accurate, and TransUnion notified Sosa. (*Id.* ¶¶ 41-42, Exs. A-7, A-8.)

### iv. Sosa's May 2019 Dispute

On or about May 20, 2019, Sosa again sent a written dispute:

> This account has been false reporting! This account was originally opened in 2012 and was settled and paid back in May of 2015. This account has been paid off and settled and closed since then. The closed date of this account should reflect accurately as well as the current status should reflect its current status of Paid and Settled! This is affecting my credit and has lowered my credit score significantly. I have contacted Greater Alliance many times and they have not been compliant in correcting its reportings. Attached is a copy of the settlement check in reference to this account.

(*Id.* ¶ 43, Ex. A-9.)[8] TransUnion initiated another reinvestigation, sending Greater Alliance an ACDV form regarding the dispute, and getting back the same response. (*Id.* ¶¶ 44-45, Ex. A-10.) TransUnion notified Sosa. (*Id.* ¶ 46, Ex. A-11.)

### v. Sosa's June 2019 Dispute

On or about June 19, 2019, Sosa sent a fifth dispute to TransUnion which indicated as follows:

> I am disputing the following account appearing on my file. This account is inaccurate, I sent the company a request to verify my account. I am disputing this account, the closed date listed is incorrect. I settled this account and paid it off in March 2015, and therefore the closed date should reflect as such, as it is listed with the other credit bureaus. As well the status field should reflect its current status, it has been settled. Enclosed, please find the final settlement check showing that this account was paid and closed out in March of 2015.

---

[8] TransUnion claims that although Sosa included a copy of a check with his correspondence, the check was for a different account. (*See* TU Resp. Stmt. ¶ 25.)

(*Id.* ¶ 47, Ex. A-12.) TransUnion initiated another reinvestigation and sent Greater Alliance an ACDV form regarding the dispute which requested, among other things, that Greater Alliance "Verify all Account information." (*Id.* ¶ 48, Ex. A-13.) Again, Greater Alliance responded the account information was accurate, and TransUnion notified Sosa. (*Id.* ¶¶ 49-50, Exs. A-13, A-14.)

### vi. Dispute Resolution

On August 8, 2019, Greater Alliance employee Socha decided to run an Experian "bullseye report" for Sosa's account—that is, a report which demonstrates what Greater Alliance is "actually reporting" to Experian—to confirm that the change she made to Sosa's account months prior was received and acted upon.[9] (Socha Tr. 47:20-24, 48:14-18.) According to Socha, the bullseye report confirmed that Experian was accurately reporting Sosa's account. (*Id.* 48:19-49:2.)

The same day, Socha sent TransUnion an AUD requesting an immediate change to the closing date on Sosa's account.[10] (*Id.* 69:17-23, 70:3-15, 75:1-3.) The AUD, which TransUnion received the next day, included updated information for more than just the closing date; for example, it listed an "Account Status" of 64 with no "Special Comments" code, last payment and closing dates in May 2015, and no payment terms. (Kimp Aff. ¶ 51, Ex. A-15.) TransUnion updated Sosa's account accordingly. (*Id.* ¶ 52.)

---

[9] Socha testified that although she can only pull bullseye reports through Experian, the information reported to one credit reporting agency should be the same information reported to the other two. (*Id.* 50:13-23, 51:24-52:4.)

[10] Yet as explained *supra*, Socha also testified that she had corrected the closing date on Sosa's account "the first time Greater Alliance received [] Sosa's dispute to Trans[U]nion." (*Id.* 47:3-7.)

### c. Sosa's Damages

Sosa claims to have suffered several adverse financial consequences as a result of the inaccuracies on his tradeline, including: (i) denial of a reconsolidation loan from Discover on January 28, 2019; (ii) denial of a reconsolidation loan from Goldman Sachs on January 28, 2019; and (iii) ineligibility for Visions Federal Credit Union's First-Time Home Buyer Program. (Pl. Stmt. ¶¶ 35-37.) He also claims to have suffered emotional distress which prompted his treatment by a psychologist, as well as physical ailments such as sleeplessness for which he was prescribed medication. (*Id.* ¶¶ 39-41.)

## III. Procedural History

On January 17, 2020, Sosa filed a FCRA complaint in Bergen County Superior Court seeking compensation for the "actual damages, mental anguish, humiliation, and embarrassment" he suffered as a result of defendants' conduct. (D.E. 1-2, Compl. ¶¶ 25, 34.) Sosa alleged that: (i) TransUnion failed to follow reasonable procedures to assure maximum possible accuracy on its consumer reports, and further failed to conduct reasonable reinvestigations to determine whether the disputed information was inaccurate in violation of 15 U.S.C. §§ 1681e(b) and 1681i(a); and (ii) Greater Alliance failed to comply with the obligations imposed on furnishers under 15 U.S.C. § 1681s-2(b). (Compl. ¶¶ 20-35.) TransUnion removed the case to this Court on January 24, 2020. (D.E. 1.)

## IV. Cross-Motions for Summary Judgment

Sosa has moved for entry of partial summary judgment on the issue of liability only against both defendants (D.E. 48), and TransUnion has cross-moved for entry of summary judgment on both liability and damages (D.E. 49). While Sosa contends that TransUnion's investigations were unreasonable as a matter of law, TransUnion argues that it employed

reasonable procedures and had no legitimate basis to disbelieve the information Greater Alliance furnished.

Greater Alliance has opposed Sosa's motion for summary judgment, but unlike TransUnion, has not cross-moved for entry of summary judgment in its favor. It argues that TransUnion is to blame for the inaccuracies on Sosa's tradeline, and further that its own investigations were reasonable in light of the information relayed by TransUnion.

### a. Summary Judgment Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(a) where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. In ruling on the motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all inferences in favor of that party. *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). The non-moving party "'must set forth specific facts showing that there is a genuine issue for trial,'" and "'[b]are assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) (quoting *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)). A factual dispute qualifies as "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Id.* at 289. And a fact is "material" if it "might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

The same standard applies when cross-motions for summary judgment are filed. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). "When [two] parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the

Rule 56 standard.'" *Auto-Owners*, 835 F.3d at 402 (alteration in original) (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

### b. FCRA Standards

The FCRA was enacted to ensure that consumer reporting agencies like TransUnion "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which his fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 223 (3d Cir. 1997) (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996)). In recognition of "the crucial role that consumer reporting agencies play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole," Congress imposed various requirements on them. *Id.* (quoting *Philbin*, 101 F.3d at 962). For example, Section 1681e(b), known as the "accuracy" section of the FCRA, requires an agency to "follow reasonable procedures to assure maximum possible accuracy" when preparing a credit report. If the accuracy of the information contained within a credit report is disputed by a consumer, Section 1681i is triggered, which details procedures for "reinvestigation" by a consumer reporting agency.

"The FCRA [also] places certain duties on those who furnish information to consumer reporting agencies." *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 357 (3d Cir. 2011). Those obligations are two-fold. First, a furnisher has a duty to provide accurate information to consumer reporting agencies. *See* 15 U.S.C. § 1681s-2(a). Second, if a furnisher receives notice of a dispute from a consumer reporting agency as to "the completeness or accuracy" of the information provided, the furnisher must: (i) conduct an investigation into the dispute; (ii) review

all relevant information provided by the consumer reporting agency; and (iii) report the results of its investigation to the consumer reporting agency. 15 U.S.C. § 1681s-2(b)(1)(A)-(C). If the furnisher's investigation reveals that the disputed information is "inaccurate or incomplete or cannot be verified," it must promptly modify, delete, or permanently block the reporting of that information. 15 U.S.C. § 1681s-2(b)(1)(E).

The accuracy and investigatory obligations imposed on credit reporting agencies and furnishers are analyzed using similar legal standards. *See Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014). As to the former obligation, information is inaccurate under the FCRA *both* when it is "patently incorrect" *and* when it is "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Bibbs v. Trans Union LLC*, 43 F.4th 331, 343 (3d Cir. 2022) (quoting *Dalton v. Capital Assoc. Indus. Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)). In other words, "even if the information in a credit report 'is technically correct, it may nonetheless be inaccurate if, through omission, it creates a materially misleading impression.'" *Id.* (quoting *Seamans*, 744 F.3d at 865). As to the latter obligation, investigations must use reasonable procedures—*i.e.*, "those that a reasonably prudent person would [undertake] under the circumstances." *Philbin*, 101 F.3d at 963 (internal citations and quotations omitted). When assessing reasonableness, the Court must balance "the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (internal citations and quotations omitted).

The FCRA "provide[s] private rights of action for willful and negligent noncompliance with any duty imposed by the FCRA." *Philbin*, 101 F.3d at 962. If a defendant's noncompliance is negligent, the FCRA allows a consumer to recover actual damages and

11

attorneys' fees and costs; if the noncompliance is willful, a consumer may also recover punitive damages. *See* 15 U.S.C. §§ 1681n, o.

### c. Discussion

Here, the record demonstrates that inaccurate information was included on Sosa's tradeline. As of July 16, 2018, the tradeline was reporting a June 2018 closing date, a December 2013 last payment date, and a monthly payment obligation when in reality Sosa had settled with Greater Alliance's collection agency in March 2015 and satisfied the debt that May. Further, the parties agree that the tradeline should have listed a "Paid-Charged Off"—as opposed to "Charged Off"—account status. The Court rejects TransUnion's argument that the account status as "Charged Off" was technically accurate when read in conjunction with the remainder of the tradeline. (*See* D.E. 67, TU Opp. Br. at 19-20.) Even were that so, the tradeline certainly created the "misleading impression" that Sosa's account was not yet paid off, especially when read in conjunction with the patently inaccurate dates and payment terms discussed above.

Accordingly, the parties' summary judgment motions rise or fall on whether defendants' procedures were reasonable, which is typically an issue reserved for trial unless "the reasonableness or unreasonableness of the procedures is beyond question." *Seamans*, 744 F.3d at 864-65 (internal citations and quotations omitted).

As to TransUnion's motion for summary judgment as a matter of law on the basis that its procedures were indeed reasonable, the record reflects that Sosa lodged a dispute with TransUnion via telephone in July 2018 and followed up with four written disputes in August 2018, March 2019, May 2019, and June 2019. In each of his written disputes, Sosa explained with varying levels of detail that his Greater Alliance account had already been paid off, which made the account terms and dates listed on his tradeline wrong. In March 2019, Sosa provided

detailed information which demonstrated that his account had been paid off four years prior in 2015, and further explained that he had contacted Greater Alliance directly to correct the inaccuracies but was unsuccessful. Yet for five months after that, TransUnion did not conduct an independent investigation and instead continued to rely exclusively on Greater Alliance's verifications.

In arguing reasonableness, and defending its exclusive reliance on what Greater Alliance was furnishing, TransUnion describes its own "numerous and varied" procedures for ensuring accuracy on the part of furnishers. These range from initial due diligence reviews and site inspections to monthly and yearly audits for accuracy. TransUnion contends that those systems never detected unreliability on Greater Alliance's part. (*See, e.g.,* D.E. 49-1, TU Mov. Br. at 15-16; *see also* TU Stmt. ¶¶ 12-13, 15-25.)

But that does not absolve TransUnion of its investigatory obligations under the FCRA particularly where, as here, even a cursory review of the tradeline revealed potential inaccuracies. Indeed, in July 2018, Sosa's tradeline included a remark that the account was settled for less than the full balance and listed a $0 balance, yet it also included a "Charged Off" as opposed to "Paid-Charged Off" pay status and referenced a monthly payment obligation. That discrepancy was detectable when TransUnion received Sosa's first dispute. Yet it forwarded the dispute via an ACDV form and relied on Greater Alliance's response that the account was reported accurately, without any analysis by either entity. TransUnion followed this approach *four more times* before the inaccuracies on Sosa's account were finally corrected. On this record, a reasonable juror could certainly find in Sosa's favor on his Section 1681e claim.

The record also contains evidence favorable to Sosa on his Section 1681i reinvestigation claim. For example, in response to Sosa's first dispute, Greater Alliance's ACDV form

13

simultaneously included a special comment code of "AU"—which indicates that an account has been settled for less than the full amount—and an account status of "97"—which denotes a charged off account. When confronted with this discrepancy during her deposition, TransUnion employee Nikisha Kimp testified as follows:

> Q: If the comments of "AU" means it was paid after charge off, then that means on the pay status because it was paid after charge off or settled after charge off, is it correct to say, based on what we discussed before, that the pay status should state "paid charge off"?
>
> A: Well, again, *we only report what is provided to us by the data furnisher*.
>
> Q: Okay. Can you give me an example of *any instance where the special comment of AU and the account status of 97 should be in the same trade line*?
>
> [OBJECTION]
>
> A: *No, I couldn't do that*.

(D.E. 56-1, Kimp Tr. 86:15-87:7 (emphasis added).)

TransUnion's admission directly contradicts what the Third Circuit had instructed it to do in *Cushman* when the court reversed TransUnion's win in the district court. Notably, the Third Circuit recognized that the "grave responsibility" imposed on agencies under Section 1681i "*must consist of something more than merely parroting information received from other sources*," and further, that a reinvestigation "that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." 115 F.3d at 225 (emphasis added). Consistent with those findings, the Third Circuit rejected TransUnion's argument in *Cushman* that it was "never required to go beyond the original source in ascertaining whether the information is accurate" and held that "in order to fulfill its obligations under § 1681i(a), 'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial sources of information." *Id.* at 224-25 *(quoting Henson v. CSC Credit*

*Servs.*, 29 F.3d 280, 287 (7th Cir. 1994)). As explained *supra*, on this record a reasonable juror could find that TransUnion simply parroted the information relayed by Greater Alliance over several months despite repeated entreaties by the consumer, and therefore could find in Sosa's favor on his Section 1681i claim.

As indicated, Greater Alliance is not seeking affirmative relief by way of summary judgment in its favor, but the record does not support its opposition to Sosa's contentions. The ACDV correspondences demonstrate that Greater Alliance confirmed on five separate occasions that Sosa's account was accurately reporting even though it was not, and listed codes and other details that corresponded with the information reported by TransUnion. The record also includes evidence of an AUD dated August 8, 2019—approximately 13 months after Sosa's first dispute—in which Greater Alliance finally instructed TransUnion to update Sosa's account in several respects.

Greater Alliance has produced no documentary evidence regarding its ACDV responses; indeed, according to Socha's deposition testimony, Greater Alliance cannot produce such evidence because it does not keep records of ACDV disputes or correspondences with credit reporting agencies. (Socha Tr. 12:6-14, 33:21-23.) Instead, the evidence demonstrates that when Socha received TransUnion's ACDV forms relaying Sosa's disputes, she: (i) took a screen shot of Sosa's information on the e-Oscar system on July 30, 2018; (ii) ran a bullseye report on August 8, 2019; and (iii) that same day, sent TransUnion an AUD requesting an immediate change to the account. Accordingly, in the record before the Court there is no evidence of Greater Alliance's investigatory procedures between July 30, 2018 and August 8, 2019 despite the fact that Sosa lodged four disputes with TransUnion during that timeframe—namely, in August 2018, March 2019, May 2019, and June 2019—and Greater Alliance each time

15

confirmed inaccurate information it had furnished. That Greater Alliance responded the way it did goes to the heart of this case, and is particularly crucial in light of Socha's skewed recollection of Sosa's disputes:

> Q: Do you *recall how many disputes concerning Mr. Sosa* Greater Alliance received from TransUnion alone?
>
> A: I think *only like one or two*. It wasn't a lot.
>
> . . .
>
> Q: And, to your knowledge, did *Mr. Sosa dispute anything else with his account besides for the dates* on how his information was being reported on his TransUnion credit report?
>
> A: *Not to my knowledge*.

(Socha Tr. 46:22-47:12 (emphasis added).)

The other evidence in the record does little to inspire confidence as to Greater Alliance's procedures. For example, Greater Alliance relies on a bullseye report which only demonstrated the information that *Experian* was reporting—*not TransUnion*—and, in any event, was run for the first time *over a year* after Sosa's first dispute. Greater Alliance also relies on the AUD it sent to TransUnion on August 8, 2019 requesting an immediate change to the closing date on Sosa's account. But the AUD is unpersuasive because: (i) Socha testified during her deposition that she had already updated that date months prior when she received Sosa's first dispute; and (ii) the AUD TransUnion received the next day resulted in *several changes* to the tradeline beyond just the one date Socha claims was inaccurately reporting. Sosa, therefore, has adduced evidence that Greater Alliance's investigative procedures were unreasonable in violation of 15 U.S.C. § 1681s-2(b).

Finally, there is sufficient evidence in the record to demonstrate that defendants' conduct resulted in actual damages, which is a necessary showing for a negligent violation of the FCRA.

*See* 15 U.S.C. § 1681o; *see also Philbin*, 101 F.3d at 970.  For example, in support of his contention that he was denied a Discover reconsolidation loan because of defendants' conduct, Sosa produced a letter from Discover listing three reasons for the denial, one of which was "charge-off"—an inaccuracy Sosa challenges in this lawsuit.  (D.E. 48-2, Zemel Decl., Ex. 6 at Sosa 000068.)  Similarly, in support of his claim that defendants' conduct caused Goldman Sachs' loan denial, Sosa produced a letter from Goldman Sachs which indicated that its denial was based on "[o]ne or more delinquent accounts" and specifically listed TransUnion as one of the reporting agencies.  (*Id.* at Sosa 000072.)[11]  On this record, "a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor' that brought about the denial of credit."[12] *Philbin*, 101 F.3d at 968.

Accordingly, the Court is satisfied that Sosa's claims against the defendants do not fail as a matter of law, which necessitates the denial of TransUnion's cross-motion for summary judgment.  This leaves two issues:  whether Sosa is entitled to summary judgment on liability as a matter of law as to both defendants under 15 U.S.C. §§ 1681e(b), 1681i, and 1681s, and the nature of damages available to him.

While there is strong evidence in Sosa's favor, the record does not have the structure for a dispositive ruling that this Court requires inasmuch as no joint final pre-trial order ("FPTO")

---

[11] TransUnion seeks to exclude the Discover and Goldman Sachs letters on grounds that they lack foundation and/or are inadmissible hearsay.  (D.E. 67-2.)  However, Sosa testified about them during his deposition (*see* D.E. 49-26, Sosa Tr. 75:14-77:1, 83:6-84:14), and there is no indication that bank witnesses would be unavailable to testify about their authenticity at trial.  Furthermore, Sosa has submitted a certification from the Vice President in the legal department at Goldman Sachs indicating that the letter Sosa received is an authentic "Adverse Action" letter. (*See* D.E. 76-4.)  Accordingly, the Court will consider both letters.

[12] Having determined that Sosa has sufficiently demonstrated causation and actual financial harm, and in light of the Court's ruling *infra*, the Court need not reach defendants' arguments regarding Sosa's emotional distress damages at this juncture.

has been filed. Without that backstop, the Court cannot determine whether defendants violated the FCRA as a matter of law and, if so, whether their conduct rises to the level of willfulness—*i.e.*, whether they "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Philbin*, 101 F.3d at 970 (internal citations and quotations omitted). The *Cushman* decision noted that the plaintiff might be awarded punitive damages if she could prove that TransUnion "adopted its reinvestigation policy either knowing that policy to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy contravened those rights." 115 F.3d at 227. Guided by *Cushman*, this Court finds that the record evidence of TransUnion's and Greater Alliance's conduct with respect to Sosa's disputes does not foreclose the availability of punitive damages in this case.

Accordingly, the Court will deny Sosa's motion for summary judgment without prejudice and directs that the magistrate judge conduct further proceedings in aid of a joint FPTO without undue delay, anticipating that Sosa will thereafter renew his motion for summary judgment. In light of the foregoing, the Court also finds that Greater Alliance's expert motion is premature and denies it on that basis. *Suter v. Gen. Acc. Ins. Co. of Am.*, 2004 WL 3751734, at *13 (D.N.J. Sept. 30, 2004) (Bassler, J.) (denying motions to preclude expert testimony as premature and directing parties to refile when case is deemed trial-ready).

**V.     Conclusion**

For the foregoing reasons, the pending motions (D.E. 48, 49, 50) are denied. The parties are directed to appear before Magistrate Judge Kiel to set a schedule for the filing of an FPTO and a schedule for Sosa's subsequent dispositive motion practice.

An appropriate order will issue.[13]

Date: December 30, 2022

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

---

[13] Because the Court has cited to sealed documents, it has filed this opinion under temporary seal. Should the parties wish to maintain this opinion under seal, they must file a motion that complies with L. Civ. R. 5.3 on or before January 16, 2023.